**MORRIS COMMUNICATIONS CORPORATION, a Georgia Corporation, Plaintiff,**

**v.**

**PGA TOUR, INC., Defendant.**

**No. 3:00–CV–1128–J–S0TJC.**

United States District Court, M.D. Florida. Jacksonville Division.

Dec. 13, 2002.

See also 117 F.Supp.2d 1322.

George D. Gabel, Jr., Timothy J. Conner, Holland & Knight LLP, Jacksonville, FL, Jerome W. Hoffman, Holland & Knight, Tallahassee, FL, for Plaintiff.

Gregory F. Lunny, James M. Riley, Richard S. Vermut, Peter Andrew Smith, Rogers, Towers, Bailey, Jones & Gay, Jacksonville, FL, Jeffrey A. Mishkin, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for Defendant.

C. Ryan Reetz, Greenberg Traurig, P.A., Miami, FL, for Intervenor.

### *ORDER*

SCHLESINGER, District Judge.

This cause is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 109, filed June 24, 2002) and Plaintiff's Response (Doc. No. 136, filed June 24, 2002); Plaintiff's Motion for Partial Summary Judgment on Liability (Doc. No. 125, filed June 24, 2002) and Defendant's Memorandum of Law in Opposition (Doc. No. 139, filed June 24, 2002)[1]; and Defendant's Motion to Strike Plaintiff's Second Notice of Supplemental Authority (Doc. No. 150, filed July 16, 2002). Following a hearing during which both sides presented oral argument on the summary judgment motions, all pending motions are ripe for consideration.

As an initial matter, Defendant's Motion to Strike is **DENIED**.

## I. Background

*Introduction*

Many issues revolve around the periphery of this case, and the Court will take a minute to address what the case is and is *not* about. The quintessential issue is who has the right to instantaneous information and its value. This case is not about the ability or right of a publisher to disseminate and profit from information and facts released into the public domain through radio or television broadcasts or through a web site. Nor is this case about the ability of the media to cover and publish information for a story in the next day's paper or even in that evening's television news coverage. The First Amendment freedom of the press, while at first blush might appear to be relevant, is not involved. *See National Broadcasting Co. v. Communications Workers of America*, 860 F.2d 1022, 1024 (11th Cir.1988)(stating that the First Amendment right of Free Press does not apply absent state action). The case, in general, does not resolve issues of journalistic integrity.[2] This case is to some ex-

---

1. The summary judgment motions and responses were originally filed under seal, and were unsealed by Court Order on June 24, 2002.

2. Morris claims that journalistic integrity requires a journalist to report on news firsthand, if possible, instead of relying on what the creator of the news reports to the journalist or in some fashion to have the ability to verify questionable facts that come to their attention before publishing them. Morris's goal in this suit is to get access to the PGA Tour's scoring system, which will allow Morris to report scores of golfers, but only the scores that the PGA Tour relays to Morris,

tent about Morris's claimed ability or need to track a single player, ranked 100, from a small town who is not currently covered by the leader-board or being covered by the broadcast station. Morris needs access to all the players' scores to relate to a local following in that small town where its native son or daughter stands in relation to the other players in the tournament. Finally, this case is not about "streaming" video and audio or "webcasting."[3]

*Factual Background*[4]

Plaintiff, Morris Communications Corporation ("Morris"), is a Georgia corporation that publishes over thirty traditional print newspapers as well as a number of Internet-based, electronic newspapers. Defendant, PGA Tour, Inc. ("PGA Tour"), is a Maryland corporation with its principal place of business in Ponta Vedra, Florida. The PGA Tour is mainly engaged in the business of promoting professional golf tournaments throughout North America, collectively known as the PGA Tour. Players on the PGA Tour, generally recognized to be among the best golfers in the world, assign all television, radio, motion picture and other rights related to PGA Tour events to the PGA Tour, and with limited exceptions, are restricted from competing in tournaments sponsored by other entities. The record evidence in this case

shows that the PGA Tour is the most widely recognized professional golfing tour in the United States. Although there are other golf tournaments which generate fan interest, few can rival PGA Tour events in terms of overall popularity.

At issue in this case is the extent to which the PGA Tour may be allowed to limit the access of Morris and other media entities to its own private golf tournaments. Specifically, the Court must resolve whether the PGA Tour may legally condition access to its tournaments on Morris's agreement not to syndicate "real-time" golf scores obtained from an on-site media center. As this Court noted in its Order denying Morris's Motion for Preliminary Injunction[5] and as the parties have emphasized throughout these proceedings, this case is more than simply about golf scores. Rather, it presents a novel and compelling question of who has the "right" to report the news, produced and gathered by others, in an age of near-instantaneous information.

PGA Tour events are covered extensively by a number of different print, broadcast, and electronic media organizations. Although these events are conducted on private golf courses, the PGA Tour issues credentials to members of the media who

through a procedure the PGA Tour developed and has in place to gather simultaneous scores in its golf tournament. If Morris were to prevail on its claims, its journalists would, by its own standards, publish information gathered by others. Morris employees do not actually view the action they report on, but merely copy numbers provided by PGA Tour, whether in the media tent or through the PGA Tour's web site. If Morris's reporters believe the PGA Tour's information is incorrect, they may ask that the PGA Tour verify it in order to maintain journalistic integrity, but Morris would only seek to verify unusual scores. For example, if a golfer scores a 9 on a par 3 hole (par is the average or expected number of strokes a player would use to complete the hole), Morris contends that it would alert the

PGA Tour and ask that the unusual score be verified. However, Morris would not ask to verify a golf score of 2 or 4 on a par 3 hole, even though that score might be as inaccurate as the score of 9.

3. For a description and definition of "streaming" and "webcasting", see Fan, *When Channel Surfers Flip to the Web: Copyright Liability for the Internet Broadcasting*, 52 Fed. Comm. L.J. 619, 622–27 (2000).

4. The parties do not dispute the facts, only their import.

5. *Morris Communications Corp. v. PGA Tour, Inc.*, 117 F.Supp.2d 1322 (M.D.Fla.2000).

are thereby invited to its tournaments for the purpose of providing media coverage. Traditionally, Morris and its subsidiary publications have been among the entities that have received media credentials to PGA Tour tournaments. Both the PGA Tour and members of the media have traditionally benefitted from this arrangement in that the media are better positioned to satisfy the public's demand for golf-related information, and the PGA Tour enjoys enhanced publicity, which in turn generates greater demand for its golf tournaments and related goods and services, thus producing revenue for the PGA Tour.

*Real Time Golf Scores*

The parties' dispute in this case concerns the on-line publication of "real-time" golf scores. Real-time scores, as the term suggests, are scores that are transmitted electronically nearly contemporaneously to their actual occurrence on the golf course. In this way, Internet users are able to track during a golf tournament each participating player's progress on a hole-by-hole basis. In order to improve its scoring capabilities for its tournaments, including transmission of real-time golf scores over the Internet, the PGA Tour has designed and implemented an elaborate electronic relay known as the Real–Time Scoring System ("RTSS").

RTSS works as follows: During a given golf tournament, volunteer workers called "hole reporters" follow each group of golfers on the golf course and tabulate the scores of each player at the end of each hole. The scores are then collected by other volunteers located at each of the eighteen greens on the golf course, who, with the aid of hand-held wireless radios,

relay the scoring information to a remote production truck staffed by personnel employed by the PGA Tour.[6] The scores of all participating golfers are then processed at the remote production truck and transmitted by the PGA Tour to its Internet website, pgatour.com. The PGA Tour claims that it takes "about five minutes" for the information to be routed from the production truck to pgatour.com. At the same time, real-time scores are also transmitted to an on-site media center where accredited members of the media are able to access the scores. The same information is also transmitted to various electronic "leaderboards" located throughout the golf course for public viewing by spectators. The leaderboards do not simultaneously show the real time scores of all participating golfers. Rather, they typically show only the top ten or fifteen scores.

Due to the nature and size of golf courses, which may span as much as 150 acres, comprehensive real-time scores—that is, up-to-the-minute scores of every competitor—can only be compiled using a relay system such as RTSS. During a golf tournament, different groups of players compete contemporaneously at different holes such that any one spectator can only view a limited number of players at any one of the eighteen holes. Thus, in order to generate real-time scores, it is necessary to have individuals stationed at each hole as the tournament progresses so that the entire golf course can be monitored simultaneously. Acknowledging that some kind of relay system is needed to generate the type of real-time scoring information it wishes to syndicate, Morris submits that it is unable to implement such a system itself due to the PGA Tour rules prohibiting

---

**6.** Under newly developed technology known as "Shotlink," the walking scorers themselves will be able to relay scores directly to the production truck. In addition, the new technology allows the scorers to transmit additional data such as club selection, the lie of the ball, and the distance to the pin. Morris has not sought to syndicate any information obtainable from Shotlink other than the raw score.

unauthorized use of wireless communication devices on the golf course at its tournaments.[7]

Although the exact amount is unknown, it appears that the PGA Tour has invested tens of millions of dollars in RTSS, dating back to the early 1980s. Nevertheless, not all of this investment has been devoted solely to developing Internet-based scoring. The Internet did not rise to prominence until at least the mid–1990s, and pgatour.com did not become operational until 1997. Moreover, the evidence in this case shows that RTSS was, and continues to be, developed with an eye toward enhancing the on-site scoreboards for live spectators and for television broadcasts. For example, Ken Finchem, who is presently the Commissioner of the PGA Tour, noted in 1990 that "the electronic scoreboard system was created to provide the growing number of spectators at PGA Tour tournaments with up to the minute information on action all around the course."

Additionally, the Internet presently represents only a small fraction of the PGA Tour's overall revenue. For example, the PGA Tour's annual revenues from its Internet syndication contracts is approximately $130,000. In contrast, a 1999 financial audit of the PGA Tour revealed "direct" revenues of $306,510,000, which included revenues from television and tournaments.

Nevertheless, the PGA Tour has made no secret in this litigation of its desire to maintain a commercial advantage in the market for selling real-time golf scores and has vigorously defended its right to protect its proprietary investment in RTSS.

To that end, it has enacted a series of regulations designed to prevent potential competitors from immediately selling scores obtained in the media center to third parties.

*On Line Service Regulations*

Prior to 1999, credentialed members of the media could view scores in the media center and then re-key them directly into their own computers for transmission to their company's Internet servers. The result was that competitors of pgatour.com, including Morris, were able to publish real-time scores on their web sites as fast as or possibly faster than pgatour.com. Beginning in January 1999, shortly after the PGA Tour entered into an exclusive syndication contract with USA Today, it instituted Online Service Regulations ("OLSR") applicable to all credentialed media invitees. Around the same time, Morris began publishing scores from PGA Tour tournaments on its web sites and selling them to third parties, and Morris appears to have been the PGA Tour's only major competitor in the syndication market.[8]

Under the terms of the original OLSR, scoring information obtained from the media center could be published on any web site, but not sooner than 30 minutes after the actual occurrence of the shots. The PGA Tour's admitted purpose for the new regulations was to allow it to have the first opportunity to post the real-time scores on its web site and those of its syndicates.

In April 1999, the PGA Tour amended its OLSR so that scoring information, obtained in the media center, could appear on an unaffiliated web site *either* no sooner

---

**7.** Morris has also argued that it would be socially wasteful for it to duplicate the PGA Tour's efforts in implementing such a system.

**8.** While Morris was the only major competitor in the syndication market, many competitors, such as www.thegolfchannel.com, www.nbc.com, and www.golfonline.com, still vied for market share in the distribution of golf scores on the Internet.

than 30 minutes after the actual occurrence of the shots *or* when the information became legally available as public information.[9] Shortly afterwards, the PGA Tour agreed to allow Morris to immediately publish scores obtained from the media center on its own web-sites, but not on the web-sites of non-credentialed third parties. In January 2000, the PGA Tour again amended its OLSR so that "no scoring information may be used by, sold, given, distributed or otherwise transferred to, any party other than the Credentialed Site in any manner whatsoever, without the prior written consent of the PGA Tour." Violators were subject to revocation of their media credentials.

In May 2000, the PGA Tour learned that Morris was planning to sell scoring information obtained directly from the media center to the Denver Post, in violation of the January 2000 OLSR. The PGA Tour reminded Morris of the prohibition against syndicating scores obtained in the media center. After some discussion between the parties, the PGA Tour agreed to allow Morris to syndicate scores to the Denver Post for one tournament only.

In August 2000, after some additional negotiations, the PGA Tour agreed to waive the restriction on selling real-time golf scores to third parties on the condition that Morris agree to collect the scores to be sold for syndication from pgatour.com rather than the on-site media center. Morris attempted to gather real-time golf scoring information using this alternative method but ultimately abandoned it as unworkable. Among other problems, there was an inevitable delay in scores taken directly from pgatour.com because of the time needed to re-key the scores from that web site onto Morris's servers. In the meantime, Morris continued to negotiate syndication contracts with a number of third parties, apparently assuming that some satisfactory resolution would be reached with the PGA Tour.

On September 13, 2000, Morris informed the PGA Tour that its attempts at obtaining real-time scores through pgatour.com had failed and requested that it be credentialed to syndicate real-time scores directly from the on-site media center. The PGA Tour refused to accommodate this request. It subsequently informed Morris that media credentials would only be provided on the condition that scoring information collected from the on-site media center be used only in publications within the Morris Communications Group, as required under the OLSR.

*Motion for Preliminary Injunction*

On October 11, 2000, Morris filed its Complaint and Motion for Preliminary Injunction, alleging violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Florida Antitrust Act, Fla. Stat. § 542.19, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* Morris alleged that the PGA Tour possesses monopoly power over access to its golf tournaments and has unfairly used that power by attempting to stifle competition in the separate market for syndicated real-time golf scores. In response, the PGA Tour argued that it enjoys a property right in RTSS and that its regulations restricting the syndication of real-time golf scoring information gathered and generated by RTSS constitute a reasonable safeguard against would-be free riders seeking to unfairly capitalize on its product.

This Court denied Morris's Motion for Preliminary Injunction, finding that Mor-

---

9. Although it is a matter of contention when the scoring information becomes legally available to the public, the PGA Tour has conceded that golf scores are in the public domain once they are published on pgatour.com or are publically broadcasted on either television or radio.

ris had failed to meet its high burden for proving entitlement to injunctive relief. *See Morris Communications Corp. v. PGA Tour*, 117 F.Supp.2d 1322, 1326 (M.D.Fla. 2000). The Court found that Morris had failed to show a substantial likelihood of success on the merits of its Section 2 monopolization claims.[10] Even assuming that the PGA Tour possessed monopoly power in the market for real-time golf scores, Morris had not shown that the PGA Tour lacked a legitimate business justification for its restrictions on syndication of real-time scores. Specifically, the Court was without sufficient evidence regarding the extent to which it would be condoning free riding on the PGA Tour's proprietary investment in RTSS if it ordered the PGA Tour to allow Morris unconditional access to its on-site media centers. *Id.* at 1326–30.

*Effects of the On Line Service Regulations*

Both parties have submitted substantial evidence regarding the OLSR's possible effects on competition. Not surprisingly, the evidence is somewhat contradictory in this regard. For example, the PGA Tour produced the deposition transcript of the new media sports producer of The Augusta Chronicle, which is owned by Morris. He stated that at least one Internet syndication customer, insidetheropes.com, "never made any demands as to time length [between the occurrence of scores and their real time publication]." Similarly, Mike McLeod, the project manager for golf at CNN/SI, with whom Morris has a syndica-

tion contract, stated that even when Morris was required to transmit golf scores remotely, i.e., off of pgatour.com rather than directly from the media center, "for CNN/SI's editorial purposes, the scores were reported fast enough to be editorially acceptable."

This evidence, however, is belied by other evidence presented by Morris suggesting that both consumers[11] in the syndication market and the PGA Tour itself place a premium on speed. This evidence suggests that OLSR have the effect of harming competitors' ability to compete for the sale of syndicated real-time golf scores. For example, Mr. McLeod's comments notwithstanding, it appears that the value of Morris's syndication contract with CNN/SI has decreased dramatically since the OLSR were implemented. Under the original syndication agreement, executed in 1999, CNN/SI agreed to pay Morris approximately $431,666 annually for real-time golf scores. In 2001, when the OLSR were in effect, that amount was $185,599. By 2002, it had been further reduced to $150,000. By the same token, the record reflects that the PGA Tour has raised the prices for real-time golf scores in its own syndication agreements with USA Today. Moreover, in its most recent contract with USA Today, the PGA Tour no longer promises exclusive syndication rights, which arguably makes the agreement less valuable to USA Today despite the higher price.[12] The higher prices for real-time scores may reflect a consumer preference

---

**10.** The Court also concluded that Morris had not satisfied its burden with respect to showing irreparable harm or that the balance of harms and the public interest weighed in favor of injunctive relief. *Morris*, 117 F.Supp.2d at 1330–31.

**11.** The "consumers" in the syndication market refer generally to web-site publishers who pay other publishers for real-time scoring information; advertisers, who usually represent

the primary source of revenue for Internet web sites; and Internet users, who log on to the various web sites.

**12.** PGA Tour counters by noting that "cash" consideration (as opposed to promotional equivalents) is the same and that the new contract provides USA Today with more advertising funds and greater technical assistance, as well as expanded use of PGA Tour trademarks.

for more up-to-date scores, which is reflected elsewhere in the record. For example, hits on pgatour.com have increased by 50 to 100% since the PGA Tour first instituted its OLSR.

Perhaps most tellingly, the PGA Tour itself has acknowledged that the OLSR were implemented in order to maintain a commercial advantage. In a January 1999 letter to Carl Cannon, Vice President of Morris and Publisher of the Florida Times Union, Commissioner Finchem stated that:

> The primary reason for requiring this delay [in the OLSR] is so that *pgatour.com*, the PGA TOUR's own web site, can have a window of exclusivity for the provision to the public of our basic product, official real time scores from our events. We have found that the appearance of exclusive real time scores on our web site drives tremendous traffic volume to the site during times when tournaments are being conducted, particularly outside the television coverage window. Requiring a thirty (30) minute delay in the dissemination of scores enables us to preserve the value of our real time scoring.

Thus, the record seems to clearly indicate that the OLSR have the purpose and effect of giving the PGA Tour a commercial advantage in the syndication market and disadvantaging potential competitors, including Morris. As discussed below, this does not necessarily mean that the PGA Tour has violated any antitrust laws. Nevertheless, it is important to identify the OLSR's potentially deleterious effect on competitors, if not competition.

Moreover, Morris notes that if the PGA Tour is either unable or unwilling to publish real time golf scores from its tournaments on pgatour.com, consumers are foreclosed from obtaining such information on the Internet. Morris cites the example of the recent World Golf Championship, where pgatour.com did not publish real-time scores. As a result, the real-time scores were simply unavailable on line.

In its summary judgment papers, Morris responds to the concerns raised in the Court's Preliminary Injunction Order by arguing that it has successfully demonstrated a lack of any pro-competitive justification for the OLSR. For its part, the PGA Tour continues to assert that it has a proprietary right in RTSS and the OLSR represent a commercially reasonable way to protect its investment. The PGA Tour also argues that Morris cannot show monopoly power in any relevant market, a prerequisite to prevailing on a monopolization claim. Specifically, it asserts that there is no distinct product market for "real-time" golf scores, and Morris's monopolization claims must therefore be dismissed.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). When a moving party has discharged its burden, the nonmoving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, *Key West Harbour v. City of Key West*, 987 F.2d 723, 726 (11th Cir.1993), and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256, 257 (11th Cir.1989).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the Court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). It must be emphasized that the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported summary judgement motion. Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The parties assert, and the Court agrees, that there is no genuine issue of material fact, and summary judgment is appropriate.

**13.** Free-riding is obtaining a benefit at another's expense without contributing to it. *See* Garner, *Black's Law Dictionary*, 7th ed. at 676.

## III. Analysis

### A. Antitrust claims

Morris asserts four antitrust claims: 1) monopolization of the Internet markets, 2) unlawful refusal to deal, 3) monopoly leveraging, and 4) attempted monopolization of the Internet markets. Before addressing the elements of each of the antitrust claims, the Court will first address the PGA Tour's assertions that valid business reasons justify the exclusionary practice found in the OLSR, because valid business reasons are a defense to the antitrust claims. Once the PGA Tour asserts valid business justifications for its action, Morris bears the burden of proving that the proffered business justification is pretextual. *See U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 1002 (11th Cir.1993).

*Free-riding* [13]

Morris asks the Court to force the PGA Tour to provide Morris with the compilation of scores, for which the PGA Tour spends considerable money and time creating, at no cost to Morris. While Morris does invest its own cost in re-keying the scores for syndication, Morris free-rides on the PGA Tour's efforts in compiling the scores. As Morris admits in its Memorandum of Law, "Morris cannot duplicate the functions of RTSS, which depends on the efforts of hundreds of volunteers each week." Even if it is the efforts of "volunteers", the PGA Tour has still invested time and money in the organization and technology to make RTSS possible.[14]

Morris contends that it is not free-riding and cites to the *Kodak, Motorola,* and *Aspen* cases. *Eastman Kodak Co. v. Image*

**14.** Morris's claim that replication of RTSS would be socially wasteful belies its claim that it does not free-ride. Replication would be wasteful, precisely because the PGA Tour has invested time, money, and resources that Morris has not and does not wish to expend.

*Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Nat'l Basketball Ass. v. Motorola, Inc.,* 105 F.3d 841, 854 (2nd Cir.1997); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). However, none of these cases is applicable to the instant case. In *Motorola,* the court found that Motorola did not free-ride when it created a network that disseminated scores from NBA basketball games. *See Motorola,* 105 F.3d at 854. Three distinctions between Motorola and the instant case make Morris's claim untenable. First, the *Motorola* court used a very high standard for free-riding that is applicable only in cases with the hot-news exception, which will be discussed in greater detail below. More importantly, the information that Motorola used to create its product was in the public domain, having been broadcast on television or radio. *See id.* at 843. Specifically, Motorola-paid reporters, who had heard the radio or television broadcast scores, reported the information to a central location and merely relayed what had been known to the world. *See id.* at 844. Golf, unlike basketball, precludes a single person gathering all the information occurring on all 18 holes. So

when television and radio cover a basketball game [15], the score is presented to the public through those media outlets, allowing Motorola to obtain the information and republish it. If Morris were able to gather scores from all 18 holes through a television or radio broadcast, Morris could then republish that information, absent a hot-news exception.[16] However, golf's atypical format prevents any single television or radio broadcast from providing results from all 18 holes live.[17] The PGA Tour does publish the scores in the media center,[18] but the media cannot disseminate that information except as the PGA Tour's press credentials allow them to do.[19] As a result, the scores, which are not protected by copyright, remain outside the public domain and within the PGA Tour's control, because the PGA Tour provides access with certain restrictions.[20] Finally, Motorola benefitted from the NBA's costs in producing and marketing the games and from the radio and television stations who paid for broadcast rights: that is Motorola capitalized on the NBA's positive externalities. However, the NBA and the broadcast stations had already reaped the profits of their investment, and the information was in the public domain at the moment of

---

**15.** Similarly, any single spectator at a basketball, baseball, or football game knows the score of the game, as all the action takes place within his or her sight.

**16.** As the Court finds the "hot-news" claim inapplicable, it does not address the five requirements to prove a "hot-news" claim. *See Motorola,* 105 F.3d at 845.

**17.** Nor can a single spectator at a golf tournament know the score of all the players.

**18.** The PGA Tour also publishes the scores of the top players to the spectators, who are present under a license from the PGA Tour which prevents their dissemination of the scores off the course.

**19.** Currently, the PGA Tour allows Morris to publish the scores as quickly as it can re-key them from the media center, but the PGA

Tour does not allow Morris to sell or syndicate that information. Also, a compiler of information can limit the dissemination of that information through contracts, including contracts found on tickets. *See ProCD Inc. v. Zeidenberg,* 86 F.3d 1447, 1451 (7th Cir.1996)

**20.** Even if the information were in the public domain, the PGA Tour would have the ability to limit the use of the information it provides to Morris under contract law. *See ProCD Inc. v. Zeidenberg,* 86 F.3d 1447 (7th Cir.1996)(holding that producers of a CD, consisting of the content of publicly available phone books, could, under contract law, enjoin purchasers from selling the information, which was clearly in the public domain and not protected by copyright).

broadcasting. Additionally, once in the public domain, Motorola "expend[ed] their own resources to collect purely factual information generated in NBA games." *Id.* at 854. While here, Morris does not expend its own resources in gathering information, which is not in the public domain, but instead free-rides on the PGA Tour's compilation of scores.

Reliance on the *Kodak* case is similarly misplaced. Kodak claimed that the independent service providers (ISP) of Kodak's copiers free-rode on Kodak's investment in product development. *See Kodak,* 504 U.S. at 485, 112 S.Ct. 2072. "According to Kodak, the ISP's are free-riding because they have failed to enter the equipment and parts markets;" the Court rejected Kodak's free-riding claim. *Id.* However, this is not the type of free-riding that the PGA Tour is trying to prevent. The PGA Tour is not arguing that Morris free-rides on the PGA Tour's investment in the promotion of championship golf tournaments, but on its investment in the compilation of golf scores. Morris wants to commercially exploit information that the PGA Tour has expended money in gathering and has not reaped the full benefit possible from its investment.

Morris claims that the plaintiff in *Aspen* could not have won, if this Court accepts the PGA Tour's definition of free riding. However, *Aspen* was not a case about free riding, as the plaintiff ski company in *Aspen* did not free ride on defendant ski company's investments. The defendant, in *Aspen,* refused to sell plaintiff lift tickets at any price or even honor vouchers for tickets and discontinued a profitable joint arrangement with the plaintiff without a business justification. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 594–95, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). The plaintiff in *Aspen* was not free riding, because it was willing and attempted to pay for its customers to ski at defendant's resort.

Morris further argues that although even if it is free-riding on the collection of scores, antitrust law does not condemn such free-riding. The Court agrees with Morris in its assertion that free-riding on "positive externalities" is accepted by society and courts. *See Areeda, Antitrust Law,* Vol. III, ¶ 1613(b). However, what Morris seeks is not a positive externality. If Morris were selling the scores after the scores were released on a website, Morris would be benefitting from PGA Tour's positive externality, *i.e.,* the public's interest in information about championship golf.[21] As the near instantaneous scores are not in the public domain and as the PGA Tour maintains an interest in the score until they are in the public domain, the scores are not externalities until the PGA Tour has reaped its reward or forgone that possibility.

Morris additionally argues that even if there is free-riding, it must reach the level that would justify a "hot news" property right. However, the Court finds that to be a business justification free-riding does not have to reach the level that the *Motorola* court held necessary for a hot news exception. The *Motorola* court required the free-riding to be so pervasive that all incentives to undertake an activity would be lost. *See Motorola,* 105 F.3d at 853. However, to be a valid business reason, a much lower level of free riding will justify excluding competitors. *See Areeda, Antitrust Law,* Vol. III, ¶ 658(f)("once a proffered business purpose has been accepted as asserted in good faith and not as pretense, the defense does not require 'bal-

---

**21.** Morris has been capitalizing on this type of externality, ever since it has included golf scores in its newspapers' sports sections.

ancing' of social gains against competitive harms...").

*Property Right in the Scores*

■ The PGA Tour claims that the restrictions have a valid business justification, because they are necessary to protect a property right in the scores that it compiled by use of RTSS. Morris argues that the PGA Tour lacks a property right in the score, thus negating the claimed business justification. For the following reasons, the Court finds that the PGA Tour does have a property right in the scores compiled by the use of RTSS, but that property right vanishes when the scores are in the public domain.[22]

■ The PGA Tour's property right does not come from copyright law, as copyright law does not protect factual information, like golf scores. *See Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). However, the PGA Tour controls the right of access to that information and can place restrictions on those attending the private event, giving the PGA Tour a property right that the Court will protect.

In the early half of the 20th Century, the Supreme Court dealt with a similar issue in several cases, known as the "ticker cases". In *Board of Trade of the City of Chicago v. Christie Grain and Stock Company*, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905), the appellee sought an injunction preventing the use and distribution of "continuous quotations of prices on sales of grain." *See id.* at 245, 25 S.Ct. 637. There the Supreme Court held, "plaintiff's collection of quotations is entitled to the protection of the law. It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself.... The plaintiff does not lose its rights by communicating the

result to persons, even if many, in confidential relations to itself, under a contract not to make it public." *Id.* at 250, 25 S.Ct. 637. The Supreme Court further stated, "[t]ime is of the essence in matters like this ... if the contracts with the plaintiff are kept, the information will not become public property until the plaintiff has gained its reward. A priority of a few minutes probably is enough." *Id.* at 251, 25 S.Ct. 637.

In *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926), plaintiff sought an injunction forcing defendant to furnish plaintiff with a ticker and a declaration that defendant was a monopolist. *See id.* at 603, 46 S.Ct. 367. The Supreme Court held that the allegations did not support a claim under the Sherman Act and refused to grant the injunction. *See id.* at 603–05, 46 S.Ct. 367. The Supreme Court reiterated the holding of the *Christie* Court that the exchange had a property right in the information "which relates solely to its own business upon its own property." *Id.* at 606–07, 46 S.Ct. 367. Further, the exchange was able to determine to whom it will sell: "the ordinary right of a private vendor of news or other property." *Id.* at 605, 46 S.Ct. 367. Accordingly, the Court found that the exchange's actions were appropriate and legitimate to protect and to further its business. *See id.* at 606, 46 S.Ct. 367.

Like the "ticker cases", the instant case deals with facts that are not subject to copyright protection. The compiler of the information in both cases collects information, which it created, at a cost. Also the events occur on private property to which the general public does not have unfettered access, and the creator of the event can place restrictions upon those who enter the private property. The vastly in-

---

22. The Court, in its discussion of free-riding *supra,* found that the information and scores

when first published in the media center are not in the public domain.

creased speed that the Internet makes available does not change the calculus or the underlying property right. Accordingly, the PGA Tour, like the exchanges in the ticker cases, has a property right in the compilation of scores, but that property right disappears when the underlying information is in the public domain.

*Broadcast Rights on the Internet*

██ Whether the PGA Tour has a separate right to license or sell broadcast rights on the Internet, like sports and entertainment producers currently enjoy in dealing with television and radio, is a novel question. The Supreme Court indirectly addressed the issue in *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), when deciding the constitutionality of Communications Decency Act. In *Reno*, the Supreme Court held that the Internet, which the Supreme Court repeatedly referred to as a new medium, was not like traditional broadcast media, *i.e.,* television or radio. *Id.* at 867, 117 S.Ct. 2329. The Supreme Court distinguished the Internet and the radio transmission found in *FCC v. Pacifica Foundation,* 438 U.S. 726, 748–50, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) based on three distinctions. First, the Internet has not historically been regulated by an agency familiar with the medium. Second, available frequencies on the Inter-

net are not scarce as they are on radio. And finally, affirmative steps are required to access information on the Internet. *See Reno*, 521 U.S. at 868–69, 117 S.Ct. 2329. The Supreme Court concluded that because of these differences, Congress cannot regulate the Internet the same way it can regulate radio.

However, none of those differences mandates treating the Internet differently from radio or television in terms of property rights. Whether the government can regulate the Internet does not limit the value of Internet broadcasting or provide a rationale for restricting the use of that information. Both parties would certainly agree that the Internet provides an opportunity to profit from a product by selling advertisement. Television, radio, and print media operate on a similar, if not identical, principle: the selling of advertisement to viewers, listeners, or readers of entertainment, be it sports, entertainment, or news.[23] Therefore, the Court finds that the PGA Tour has a right to sell or license its product, championship golf, and its derivative product, golf scores, on the Internet in the same way the PGA Tour currently sells its rights to television broadcasting stations.[24]

Accordingly, the Court finds that the PGA Tour is justified in its restrictions because (1) Morris free-rides on the PGA

---

**23.** In *Bruce v. Weekly World News, Inc.,* 150 F.Supp.2d 313 (D.Mass.2001), the court accepted the opinion of both sides' experts who agreed that the Internet was a separate medium, distinct from print media, requiring a separate license for use on the Internet. The court awarded additional damages because of the infringing use on the Internet. *Id.* at 321. If a separate license is required to use a copyrighted picture on the Internet, the producers of a marketable product, like golf scores, should also be able to sell rights on that new medium.

**24.** With the emergence of "web-casting" and "streaming" video and other rapid advance-

ments in technology, a negative answer to the question of whether the PGA Tour has broadcast rights on the Internet would stymie advancement and reduce incentive to create entertainment and sports programming by foreclosing a lucrative market. *See generally, Kellis, Note: A new Technology Question of Olympic Proportions: Should NBC's License to Broadcast the Games Include Internet Broadcasting Rights?*, 8 J. Intell. Prop. L. 245 (2001). To hold otherwise would be similar to a court finding that Major League Baseball could not sell broadcasting rights to television stations in the 1940s with the advent of television.

Tour's efforts, (2) the PGA Tour has a property right in the scores before they are in the public domain, and (3) the PGA Tour has the right to license or sell broadcasting rights of its products over the Internet.

*Monopolization of the Internet Markets*

■ Monopolization, an offense under Section 2 of the Sherman Act, requires two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Services Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

1) Possession of Monopoly Power

■ Morris argues that the PGA Tour has monopoly power in the relevant market, real-time golf scores, and that power is evidenced by a reduction in output, citing *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Morris misreads the import of that decision. In *NCAA,* the district court found that absent the NCAA's regulation more college football games would be broadcast, and therefore the restrictions limited output. *See id.* at 119, 104 S.Ct. 2948. In the instant case, Morris argues that the PGA Tour's restrictions have reduced output as evidenced by the reduced number of web sites with real-time golf scores. Morris misconstrues outlets with output. Although the number of web sites with real-time golf scores might be reduced, the output of the product is not. Output is restricted in the same manner as an exclusive television broadcast contract: only one station is broadcasting any given tournament. Cer-

tainly there would be greater output if two television stations broadcast the golf tournament at the same time, but this is not the output reduction condemned by the *NCAA* court. There the Supreme Court's concern was the number of games being broadcast, not the number of stations broadcasting a single game. Morris further argues that when the PGA Tour's web site does not work, viewers have no access to real-time golf scores on the Internet. The Court disagrees with that argument, as the logical conclusion would be to force the PGA Tour to allow several television stations to broadcast a tournament, because occasionally one of the stations has technical difficulties. Output has not been reduced, and consumers have not been harmed, evidencing an absence of monopoly power exerted by the PGA Tour.[25]

2) Willful acquisition or maintenance of that power

"Liability [on the second element of a § 2 claim] turns, then, on whether valid business reasons can explain" those actions. *See Kodak* at 483, 112 S.Ct. 2072. As the Court has already found legitimate business reasons, Morris fails to meet the second element of a § 2 claim.

As Morris has failed to prove either element of a § 2 claim as a matter of law, the PGA Tour's motion for summary judgment on Morris's claim of monopolization of the Internet markets is **GRANTED**.

*Unlawful Refusal to Deal*

■ Under certain circumstances, a unilateral refusal to deal may constitute an antitrust violation. *See Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1522 (11th Cir.1990). However, in order to prevail on a claim for refusal to deal, the

---

**25.** Whether it would be a violation of antitrust law for the PGA Tour to be the sole outlet of golf scores on the Internet without offering to sell or license that information is not a question before the Court.

plaintiff must show both the existence of monopoly power · *and* anticompetitive ·intent. *See id.* ("It is clear that monopolistic or other anticompetitive intent is the key factor in determining whether a violation of § 2 has occurred."); *see also Mid–Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 615 F.2d 1372, 1388 (5th Cir.1980); *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir.1970). Courts have used two tests to determine whether a refusal to deal is a violation of antitrust law: intent test and essential facilities test.

### 1) Intent Test

██ "The intent test considers whether, under the circumstances of a case, a monopolist's conduct demonstrates an illegal intent to destroy competition." *Consolidated Gas of Fla., Inc. v. City Gas Co. of Fla.*, ·912 .F.2d 1262, 1302 (11th Cir.1990). It is not just an intent to destroy competition, for that is the nature of a competitive market, but an illegal intent as evidenced by, "conduct that unnecessarily excludes or handicaps competitors." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

Morris asserts that *Aspen* controls the outcome of this case. Morris argues that, like in *Aspen*, the PGA Tour's restriction is a stark departure from past practice and against the PGA Tour's economic interest. The facts indicate that the PGA Tour's actions are a departure from the unfettered access previously granted to the media. However, where the defendant in *Aspen* refused to deal only in order to injure the plaintiff, offering no valid justification, the PGA Tour has provided valid business justifications. *See id.* at 610, 105 S.Ct. 2847; *see also Areeda, Antitrust Law*, Vol. IIIA, ¶ 773, pg. 211 ("A legitimate purpose renders any accompanying purpose irrelevant; regardless of motive no firm has a general duty to injure itself in order to benefit a rival.") ·Also, unlike in *Aspen*, the PGA Tour is not discontinuing ·a profitable joint arrangement with Morris like the defendant in *Aspen*. *See Areeda*, ¶ 658(f), pg 136 (arguing for · a narrow reading of Aspen to unexplained interruptions of preexisting arrangement). The Court finds that the PGA Tour's actions do not unnecessarily exclude competition or handicap competitors, but are reasonable means to protect a valuable property right.

Also, Morris argues that the restrictions hurt the PGA Tour's interest by limiting the amount of press coverage of its tournament; Morris's claim is disingenuous at best. The PGA Tour's ability to profit from marketing its compilation of scores does not reduce the amount of coverage that the press has traditionally provided of the PGA Tour's tournaments. The posting of real-time golf scores on the Internet supplements traditional press coverage. The PGA Tour's restrictions, then, are not against its self-interest, as the PGA Tour has the traditional press coverage, plus the coverage and income generated· by the real-time scoring on the Internet.[26]

Consequently, the Court finds that although the PGA Tough might have an intent to harm a competitor, it is not an illegal intent.

---

**26.** Theoretically, the PGA Tour could limit the media's access to the tournament and the media center to those willing to pay a fee or to the one willing to pay the highest price. Although such a practice would be a departure from its past practice, it would not violate *Aspen*. The PGA Tour could justify the change with the business justification that the PGA Tour would be better off charging the press an access fee, than gaining the corollary benefit of increased publicity. A court would not be in a position to second guess the business model selected by a company, unless it unnecessarily excluded competitors.

## 2) Essential Facilities

█ The withholding of an essential facility is a violation of antitrust law, and an essential facility is one without which a competitor cannot enter or compete in a market. *See Covad Comm. Co. v. Bell-South Corp.*, 299 F.3d 1272, 1285–86 (11th Cir.2002). An essential facilities claim requires a showing of four elements: 1) control of the essential facility by a monopolist, 2) competitor's inability to duplicate the facility, 3) denial of the facility, and 4) feasibility of providing the facility. *See id.*

█ Initially, the Court finds that access to the media center is not an essential facility. This Court can find no case to indicate that access to proprietary information, not in the public domain, is an essential facility. Although it may be true that Morris will not be able to compete as effectively with the PGA Tour without access to RTSS, that alone does not make access an essential facility. *See Alaska Airlines v. United Airlines*, 948 F.2d 536, 544 (9th Cir.1991)("plaintiff must show more than inconvenience, or even some economic loss; he must show that an alternative to the facility is not feasible.") Additionally, other web sites, such as www.thegolfchannel.com, www.nbc.com, and www.golfonline.com, who do not have access to the media center, still compete with the PGA Tour's web site in the Internet distribution of golf scores. "Essentiality is not proven when actual or potential rivals other than the plaintiff are able to compete without the claimed facility...." *See Areeda*, Antitrust Law, Vol. IIIA, pg 204. Many competitors would compete more efficiently with access to proprietary information, but a court's role is not to force access to proprietary information in the name of competition, as that would

reduce incentive to innovate and ultimately harm consumers. *See id.* Vol. III, pg 129 ("It would be inconsistent with patent policy to use the antitrust laws to dissipate monopoly power still resting entirely or almost entirely on the unexpired patents that first created it.")

Assuming *arguendo* that access to the media center is an essential facility, one who controls an essential facility must provide access "upon such just and reasonable terms and regulations as will, in respect of use, character, and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies." *United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383, 411, 32 S.Ct. 507, 56 L.Ed. 810 (1912). However, in this case, Morris is seeking access to the media center and the scoring system at no cost, putting it at a competitive advantage to the PGA Tour.[27] The PGA Tour offers access to the scores through a license as evidenced by its contract with USA Today, and Morris is free to negotiate for the purchase of a license which would put it on a competitive plane with the PGA Tour.

As this Court stated in its denial of a preliminary injunction, "it is not unlawful for a Defendant even one who possesses monopoly power- to refuse to deal with its competitors if there are legitimate pro-competitive reasons for that refusal." *Morris Communications Corp. v. PGA Tour, Inc.*, 117 F.Supp.2d 1322 (M.D.Fla. 2000). As the Court finds that the PGA Tour's restrictions are justified and not against its economic self interest, Morris's claim under the intent test or essential facilities test cannot stand as a matter of

---

**27.** If the Court were to rule for Morris, the Court would have to decide what price Morris would need to pay in order for it to be placed on an equal footing with the PGA Tour. Such rate making is not the appropriate role for a court. *See generally, Consolidated Gas Co. of Florida v. City Gas Co.*, 912 F.2d 1262, 1320 (11th Cir.1990)(Tjoflat, C.J.dissenting).

law. Accordingly, the PGA Tour's motion for summary judgment on Morris's claim of unlawful refusal to deal is GRANTED.

*Monopoly Leveraging*

Monopoly leveraging refers to a monopolist's use of its market power to gain a competitive advantage in a different level or in a different market. *See Consolidated Gas Company of Florida, Inc. v. City Gas Company of Florida,* 912 F.2d 1262, 1284–85 (11th Cir.1990)(Tjoflat, C.J., dissenting). Neither the Eleventh Circuit nor the Supreme Court has accepted this theory of antitrust violation, and the Court finds that it is unnecessary to determine its applicability in the instant case. *See Aquatherm Industries Inc. v. Florida Power and Light Co.,* 971 F.Supp. 1419, 1432 (M.D.Fla.1997).

Under the Second Circuit's analysis of monopoly leveraging, a plaintiff must make a showing of anticompetitive intent or an unlawful exercise of power. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272–75(2d Cir.1979). As the Court found *supra,* the PGA Tour's conduct is not anti-competitive nor an unlawful exercise of power. Although it might harm Morris, the conduct is an attempt to protect proprietary information and avoid free-riding by a competitor. Accordingly, the PGA Tour's motion for summary judgment on Morris's claim of monopoly leveraging is **GRANTED**.

*Attempted Monopolization of the Internet Markets*

■ Attempted monopolization has three elements: 1) the defendant's specific intent to achieve monopoly power through predatory or exclusionary conduct, 2) the defendant engages in such conduct, and 3) there exists a dangerous probability that the defendant will succeed. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 994 (11th Cir.1993). "Specific intent does not merely mean intent to prevail over ones rivals; it goes beyond that to

include an intent to control prices or to restrain competition unreasonably." *General Industries Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 801 (8th Cir.1987). The Court will not address elements two or three, as it finds the first element dispositive.

A finding of legitimate pro-competitive business reasons forecloses a finding of predatory or exclusionary conduct. *See Technical Resource Services, Inc., v. Dornier Medical Systems, Inc.,* 134 F.3d 1458, 1467 (11th Cir.1998)("A defendant can escape § 2 liability if the defendant's actions can be explained by legitimate ·business justifications.") As the Court has already found the PGA Tour's conduct justified by legitimate business reasons, the PGA Tour's Motion for Summary Judgment on Morris's claim of attempted monopolization is **GRANTED**.

**B. Florida Deceptive and Unfair Trad Practice Act Claims**

■ Along with the antitrust claims, Morris brings a claim under the Florida Deceptive and Unfair Trade Practice Act (FDUPTA), Section 501.201, *et. seq.* FDUPTA defines violation of the act in subsection 501.203(3), as "any violation of this act and may be based upon any of the following:(a) Any rules promulgated pursuant to the Federal Trade Commission Act, *15 U.S.C. s. 41* et seq. or this act; (b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or· the federal courts; (c) Any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." *Mack v. Bristol–Myers Squibb Co.,* 673 So.2d 100, 103–04 (Fla. 1st DCA 1996). FDUPTA is to be construed consistently with antitrust law. *See id.,* at 103. Morris is correct in its assertion that FDUPTA is not limited

to antitrust violations, but Morris points only to antitrust law as a foundation for its FDUPTA claim. As this Court has found no violation of antitrust law and as Morris asserts no other basis for a claim under FDUPTA, the PGA Tour's Motion for Summary Judgment on Morris's FDUPTA claim is **GRANTED**.

### C. Claim of Tortious Interference

The PGA Tour raises three reasons for its Summary Judgment Motion, but the Court will only address the last: the PGA Tour's actions were justified and not actionable. Florida courts recognize that, "If a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable". *Heavener, Ogier Servs. Inc., v. R.W. Florida Region Inc.,* 418 So.2d 1074, 1076 (Fla. 5th DCA 1982); *see also Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1321 (11th Cir.1998); *Ethyl Corp. v. Balter,* 386 So.2d 1220, 1224 (Fla. 3d DCA 1980). As the Court has already found the PGA Tour's actions were designed to protect its property interest and not improper, the Court finds that the PGA Tour's actions are privileged. Accordingly, the PGA Tour's Motion for Summary Judgment on Morris's claim of tortious interference is **GRANTED**.

### IV. Conclusion

As discussed above, the PGA Tour's Motion for Summary Judgment on all of Morris's claims is **GRANTED**. Because Morris's Motion addresses the same issues which the Court has discussed above, Morris's Motion for Partial Summary Judgment on liability is **DENIED**.

The clerk shall enter judgment accordingly and close the file. Further, the PGA Tour's Motion to Continue Trial (Doc. No. 167, filed December 4, 2002) is **DENIED** as moot.