[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 31, 2004
THOMAS  K. KAHN
CLERK

Nos. 03-10226, 03-11502

D. C. Docket Nos. 00-01128 CV-J-20-HTS
00-01128 CV-3-J-20HTS

MORRIS COMMUNICATIONS CORP.,
a Georgia Corporation,

Plaintiff-Appellant,

versus

PGA TOUR, INC.,

Defendant-Appellee.

Appeals from the United States District Court
for the Middle District of Florida

**(March 31, 2004)**

Before EDMONDSON, Chief Judge, DUBINA and COX, Circuit Judges.

DUBINA, Circuit Judge:

Plaintiff-Appellant, Morris Communications Corp. ("Morris"), brought suit against Defendant-Appellee PGA TOUR, Inc. ("PGA"), alleging that PGA violated section 2 of the Sherman Act, codified at 15 U.S.C. § 2, by monopolizing the markets for (1) the publication of compiled real-time golf scores on the internet, and (2) the sale, or syndication of those scores. In addition, Morris alleged that PGA further violated section 2 of the Sherman Act by refusing to deal with Morris. The district court granted summary judgment in favor of PGA because it found, *inter alia*, that PGA had a valid business justification for its actions. For the reasons that follow, we affirm the judgment of the district court.

## I. BACKGROUND

### A. Facts

Morris is a media company that publishes print and electronic newspapers. PGA is the sponsor of a series of professional golf tournaments throughout North America known as the PGA Tour. In order to provide golf scores during its tournaments, PGA has developed a Real-Time Scoring System ("RTSS") that allows PGA to monitor the play around the entire golf course. RTSS is an elaborate electronic relay scoring system that relies on state-of-the-art computer technology and equipment as well as dozens of trained workers and volunteers.

RTSS works as follows. During a PGA golf tournament, volunteers known as walking scorers follow each group of golfers on the course and tabulate the scores of each player at the end of each hole played. The scores are then collected by other volunteers, known as hole reporters, located at each of the eighteen greens on the golf course, who relay the scoring information to a remote production truck staffed by PGA personnel. The scores of all participating golfers are then processed at the remote production truck and transmitted to PGA's website, www.pgatour.com, as real-time golf scores, which are scores that are transmitted electronically nearly contemporaneously to their actual occurrence on the golf course. At the same time, the compiled scores are also transmitted to an on-site media center where members of the media are able to access the scores. The same information is also transmitted to various electronic leaderboards located throughout the golf course. As their name suggests, the leaderboards typically show only the top ten or fifteen players' scores.

The nature of a PGA golf tournament makes it impossible for one person to physically follow all the players at once. First, the average golf course spans approximately 150 acres and various golfers play numerous holes simultaneously. In addition, the PGA does not allow its invitees to use cell phones and hand-held devices on the course because such devices might disrupt play. Therefore, the

only source of compiled golf scores for all tournament players is RTSS. Likewise, the only physical location at which to obtain compiled golf scores is the media center.

In order for media organizations to have access to the PGA media center, they must obtain free press credentials from PGA. To obtain these credentials, all media organizations must agree to follow PGA's terms and conditions, including PGA's On-Line Service Regulations ("OLSR"). The OLSR require media organizations to delay publication on their internet websites of scoring information obtained by RTSS until the earliest of (1) thirty minutes after the actual occurrence of the shot[1] or (2) such information has become legally available in the public domain, i.e. after the scores are posted on PGA's official website, www.pgatour.com.[2] In addition, the OLSR prohibit credentialed media

---

[1] Prior to 1999, credentialed members of the media could view scores in the media center and then re-key them directly into their own computers for transmission to their company's Internet servers. The result was that competitors of pgatour.com, including Morris, were able to publish real-time scores on their web sites as fast as or possibly faster than pgatour.com. Beginning in January 1999, shortly after the PGA Tour entered into an exclusive syndication contract with USA Today, it instituted [OLSR] applicable to all credentialed media invitees. Around the same time, Morris began publishing scores from PGA Tour tournaments on its web sites and selling them to third parties, and Morris appears to have been the PGA Tour's only major competitor in the syndication market.

*Morris Communications Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1274 (M.D. Fla. 2002). The version of the OLSR at issue here was instituted in January 2000.

[2] PGA agreed that once the golf scores are posted on its website, they are in the public domain. *Id.* at 1275 n.9.

organizations from selling, or syndicating, compiled scoring information obtained in the media center to non-credentialed third-party internet website publishers without first buying a license to do so from PGA.[3]

Morris contends that, as a result of the OLSR, PGA is the only entity able to publish and sell real-time golf scores. Thus, Morris continues, PGA has an unfair advantage in the publication and syndication of the scores. PGA counters that it adopted the OLSR to preserve the value of its investment in creating and developing RTSS and to promote the competitiveness of its own website.

Based on the allegedly illegal OLSR, Morris filed suit against PGA, asserting four antitrust claims: (1) monopolization of the internet markets, (2) unlawful refusal to deal, (3) monopoly leveraging, and (4) attempted monopolization of the internet markets.[4]

## B. Procedural History

After extensive pre-trial discovery, the parties filed cross-motions for summary judgment on each claim. The district court granted PGA's motion for

---

[3] "No scoring information may be used by, sold, given, distributed or otherwise transferred to, any party other than the Credentialed Site in any manner whatsoever, without the prior written consent of PGA TOUR." [R. Vol. 1 at Tab 1, Exh. 4.]

[4] Morris also alleged violations of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 *et seq.*, and tortious interference with contract. Morris has not appealed the district court's grant of summary judgment in favor of PGA on these claims.

summary judgment, finding that PGA had a valid business justification for its OLSR because the OLSR prevented Morris from free-riding on PGA's investment in its costly RTSS. Accordingly, the district court found that PGA had not violated the antitrust laws even if it operated a monopoly and refused to deal with Morris.[5]

Subsequent to the granting of summary judgment in favor of PGA, Morris filed a Rule 60 motion for relief from judgment on the ground that, following the issuance of judgment in favor of PGA, PGA adopted new terms of service ("TOS") regarding www.pgatour.com in further violation of § 2 of the Sherman Act. The new TOS prohibit anyone from using the information displayed on www.pgatour.com for a commercial purpose without first buying a license from PGA. The district court denied the motion, finding that the new TOS were beyond the scope of the instant lawsuit, which addressed only PGA's media credentialing regulations and the OLSR. Accordingly, the district court found that Morris's challenge to the new TOS would be more aptly addressed in a separate lawsuit.

_____

[5] The district court did not, however, find that PGA had unlawfully monopolized or refused to deal. To the contrary, the district court found that Morris failed to prove a § 2 claim of monopolization as a matter of law, *Morris Communications*, 235 F. Supp. 2d at 1283; that the media center was not an essential facility, *id.* at 1285; that PGA did not have unlawful intent to harm competition or a competitor, *id.* at 1284, and thus did not unlawfully refuse to deal with Morris, *id.* at 1285-86, engage in unlawful monopoly leveraging, *id.* at 1286, or unlawfully attempt to monopolize, *id.*

Morris timely and separately appealed the adverse summary judgment and Rule 60 orders. This court consolidated the two appeals.

## II. STANDARDS OF REVIEW

This court reviews *de novo* whether the district court correctly granted summary judgment in favor of PGA on all counts, applying the same standard that governed the district court. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325 (11th Cir. 2001).

This court reviews whether the district court correctly denied Morris's Rule 60 motion for abuse of discretion. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 905 (11th Cir. 1998).

## III. ANALYSIS

Before discussing the antitrust issues in this case, it is important to note what this case is *not* about. Contrary to the arguments of Morris and its *amici curiae*, this case is not about copyright law,[6] the Constitution, the First

---

[6] The arguments of Morris and its amici, who are various media organizations, entities, and associations, focus largely on irrelevant copyright law and argue that facts, such as golf scores, and compilations of facts are generally not a proper subject for copyright protection. While this assertion is a correct statement of law, it has no bearing on whether the golf scores and compilation of golf scores are the proprietary product of PGA's RTSS. At oral argument, Morris conceded that this is not a copyright case.

Amendment,[7] or freedom of the press in news reporting. This case is a straight-forward antitrust case involving a product and a defendant's assertion of a valid business justification as its defense to anticompetitive actions, if any. Also important to note is that this case is being decided based upon the facts presented, not a hypothetical situation, no matter how probable its actualization.[8] Accordingly, the only real issue before us is whether PGA's restrictions and prohibitions regarding Morris's ability to *sell* compiled real-time golf scores to third parties violates § 2 of the Sherman Act. We do not address Morris's right of access to and internal dissemination of compiled real-time golf-scores, as permitted by the PGA.[9]

---

[7] In its argument for summary judgment in the district court, Morris stated that "this case is not a First Amendment case . . . [i]t's an antitrust case." [R. Vol. 10 at pp. 8-9.]

[8] As the district court stated at the hearing on the cross-motions for summary judgment, "all that this court is interested in is the issues that you people bring to it. We're not making advisory opinions. And we don't change the facts. The facts are what the facts are. And what [we] rule on today may be a lot different than the case the two of you are involved in tomorrow." [R. Vol. 10 at p. 106.]

[9] At the hearing regarding the preliminary injunction, the district court asked counsel for PGA if PGA would permit "Morris . . . to disseminate this information to its companies, its various news companies, not charging them anything, just disseminating it"? Counsel for PGA responded:

> There's no problem because that to us is news coverage, and . . . [w]e eagerly, eagerly invite and want the press to do their function, their normal function of gathering and disseminating the news, and because it's so important to us to have them do that, we told Morris a year ago that we would allow them in the media center to sit there and re-key right from there into their own website and any of their related companies as a matter of news coverage, they could have those real-time scores right away for free. . . . The problem comes in only when Morris wishes to go into another business, which they label

*A. Monopolization*[10]

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States, . . . shall be deemed guilty of a felony. . . ." 15 U.S.C. § 2. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966).

---

the news syndication business. . . . [I]t is not the business of gathering and disseminating news. It is the business of selling a commercially valuable product that we have developed and paid for and we ought to be the ones to sell that.

[R. Vol. 8 at pp. 34-36.]

[10] Morris challenges the district court's resolution of its monopolization and attempt to monopolize claims. For the purposes of this case, the elements of the two offenses differ in only one material respect: attempt to monopolize requires specific intent to achieve monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 890-91, 122 L. Ed. 2d 247 (1993) ("[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."). Therefore, the attempt claim in this case is more difficult to maintain and prove. Because Morris does not withstand summary judgment on its monopolization claim, it cannot maintain its attempt claim. Accordingly, we decline to discuss the attempt claim further.

The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 1005, 100 L. Ed. 1264 (1956). The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market. *See United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001). In order for a practice to be exclusionary, "it must harm the competitive *process* and thereby harm consumers." *Id.* "[H]arm to one or more *competitors* will not suffice" for a § 2 violation. *Id.*; *see also Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983) ("The relevant inquiry is not whether [a company's] present attempt to exclude adversely impacts competition but rather whether its acquisition of the power to exclude competitors had a sufficiently adverse impact on competition to constitute a [Sherman Act] violation.").

*B. Refusal to Deal*[11]

Two theories exist upon which to predicate a unilateral refusal to deal claim: (1) the intent test and (2) the essential facility test. *Mid-Texas*

---

[11] Morris challenges the district court's resolution of its refusal to deal and monopoly leveraging claims. For purposes of this case, the elements of the two claims are sufficiently similar to warrant only one discussion. *See Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 124 S. Ct. 872, 883 n.4 (2004) ("[L]everaging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected.").

*Communications Sys., Inc. v. AT&T*, 615 F.2d 1372, 1387 n.12 (5th Cir. 1980).[12]

Under the intent test, it is unlawful for a monopolist to maintain or extend its

monopoly power by intentionally engaging in conduct that unnecessarily excludes

competitors and impairs competition. *See id.* at 1388; *see also Eastman Kodak*

*Co. v. S. Photo Materials Co.*, 273 U.S. 359, 47 S. Ct. 400, 71 L. Ed. 684 (1927).

Under the essential facility test, a company that has exclusive control over a

facility essential to effective competition may not deny potential competitors

access to that facility on reasonable terms and conditions if to do so would create

or maintain monopoly power in the relevant market. *Covad Communications Co.*

*v. BellSouth Corp.*, 299 F.3d 1272, 1285 (11th Cir. 2002), *cert. granted and*

*judgment vacated on other grounds*, 124 S. Ct. 1143 (2004); *MCI*

*Communications Corp. v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983); *see also*

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 124 S. Ct.

872, 881 (2004) ("The indispensable requirement for invoking the doctrine is the

unavailability of access to the 'essential facilities'; where access exists, the

doctrine serves no purpose."). The plaintiff has the burden of proving that the

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207-09 (11th Cir. 1981) (en banc), this court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981.

defendant controls an essential facility that cannot be practically or economically duplicated. *See Covad Communications*, 299 F.3d at 1285.

In the absence of any purpose to create or maintain a monopoly, however, a company may deal or refuse to deal with whomever it pleases. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-02, 105 S. Ct. 2847, 2857, 86 L. Ed. 2d 467 (1985) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S. Ct. 465, 468, 63 L. Ed. 992 (1919)). Even a company with monopoly power has no general duty to cooperate with its business rivals and may refuse to deal with them if valid business reasons exist for such refusal. *See Mid-Texas Communications*, 615 F.2d at 1388.

Ordinarily, when determining whether a defendant has violated § 2 of the Sherman Act, we first determine the relevant market and then decide whether the defendant possessed monopoly power in that market. In this case, however, we do not pursue such an inquiry because we agree with the district court that even if PGA possessed monopoly power in the relevant market, Morris's § 2 claims cannot prevail because PGA has a valid business justification for its actions. Therefore, even if PGA is monopolistic, and even if PGA refused to deal with Morris, it has not violated § 2 of the Sherman Act.

### C. Valid Business Justification as a Defense

"The Sherman Act is . . . the 'Magna Carta of free enterprise,' but it does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Verizon Communications*, 124 S. Ct. at 883 (internal quotations omitted). To the contrary, "Section 2 of the Sherman Act . . . seeks merely to prevent *unlawful monopolization*" and unlawful refusals to deal. *Id.*

Unlawful monopoly power requires anticompetitive conduct, which is "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (8th Cir. 1987); *see also Lepage's Inc. v. 3M*, 324 F.3d 141, 153-54 (3rd Cir. 2003) (discussing *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003)). Likewise, refusal to deal that is designed to protect or further the legitimate business purposes of a defendant does not violate the antitrust laws, even if that refusal injures competition. *See Aspen Skiing*, 472 U.S. at 604, 105 S. Ct. at 2858; *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137, 119 S. Ct. 493, 499, 142 L. Ed. 2d 510 (1998) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 113 S. Ct. 2578, 2589, 125 L. Ed. 2d 168 (1993)), for the

13

proposition that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"); *United States Football League v. National Football League*, 842 F.2d 1335, 1360 (2d Cir. 1988) (concluding that no § 2 liability existed where network's actions were based on desire "to obtain $736 million in rights fees, not to exclude competitors").

Once the defendant has met its burden to show its valid business justification, the burden shifts to the plaintiff to show that the proffered business justification is pretextual. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1002 (11th Cir. 1993); *see also Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).

In this case, PGA met its business justification burden by showing that it seeks to prevent Morris from "free-riding" on PGA's RTSS technology. *See Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55, 97 S. Ct. 2549, 2560, 53 L. Ed. 2d 568 (1977) (stating that prevention of "free-riding" by competitors is a legitimate business purpose); *Consultants & Designers*, 720 F.2d at 1559 (concluding that defendant "had a legitimate interest in protecting from opportunistic appropriation its investment in acquiring the information necessary to carry on its business"). To achieve its business purpose, PGA has refused to

14

grant Morris access to PGA tournaments unless Morris agrees not to sell the product of PGA's proprietary RTSS – compiled real-time golf scores – to non-credentialed third-party internet publishers. Morris responds that it has a right to sell such product notwithstanding that RTSS was developed and paid for, and is operated by, PGA.[13] We disagree with Morris. The compiled real-time golf scores acquired through RTSS are not a product that Morris has a right to sell because they are a derivative product of RTSS, which PGA owns exclusively.[14] We agree with the district court that PGA "has a right to sell or license its product, championship golf, and its derivative product, [compiled] golf scores, on the Internet in the same way the [PGA] currently sells its rights to television broadcasting stations." *Morris Communication Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1282 (M.D. Fla. 2002).

---

[13] Morris also argues that PGA is not allowed to put restrictions on the dissemination of the compiled golf scores once they reach the media center because PGA did not previously put any restrictions on their dissemination. This argument is unpersuasive. PGA has a right to control its property interest in its RTSS and the compiled golf scores, which are the product of RTSS, regardless of its past practices. As the district court stated: "what [PGA] say[s] the delay should be and what delay [PGA] can legally impose are two different things perhaps." [R. Vol. 10 at p. 104.] The lack of prior restrictions is merely indicative of PGA's symbiotic relationship with the media.

[14] Morris stated in the district court that it was "not disputing that [PGA] may have a property right." [R. Vol. 10 at p. 93.] As counsel for PGA stated at the hearing on the preliminary injunction: "without this elaborate, comprehensive system there wouldn't be real-time scores that Morris would like to sell to third parties. It just wouldn't be there because these don't exist in the air." [R. Vol. 8 at p. 31.]

15

If Morris wishes to sell PGA's product, it must first purchase it from PGA. *See Consultants & Designers*, 720 F.2d at 1559 (explaining that plaintiff did not have the right to abrogate defendant's property interest). Section 2 of the Sherman Act does not require PGA to *give* its product freely to its competitors. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (stating that it "is not a function of the antitrust laws" to equip plaintiffs with defendants' competitive advantages). PGA is willing to sell its product to its competitors, including Morris, thereby allowing credentialed media organizations like Morris to syndicate compiled real-time golf scores after paying a licensing fee to PGA. Accordingly, we conclude from the record that PGA has satisfied its burden to show a valid business justification.

D.  *Business Justification Is Not Pretextual*

Because PGA has met its burden of showing that its asserted business justification is valid, the burden shifts to Morris to allege facts that support an inference that the proffered justification is merely pretextual, thereby establishing genuine issues of material fact. *U.S. Anchor Mfg.*, 7 F.3d at 1002; *see also Image Technical Servs.*, 125 F.3d at 1212. Morris argues that PGA's only justification for its refusal to deal with Morris on Morris's terms is economic and such sole motivation is not a valid business justification; thus, PGA's justification is

16

pretextual. *See LePage's*, 324 F.3d at 163 ("[D]efendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to § 2 monopolization.").

Morris supports its argument with a series of cases which are fundamentally distinguishable from this case. In the cases upon which Morris relies, the plaintiffs alleging antitrust violations had created with their own work and efforts, or purchased with their own money, their *very own products* that defendants prohibited them from selling. *See, e.g.*, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 485, 112 S. Ct. 2072, 2092, 119 L. Ed. 2d 265 (1992) (plaintiffs "invest substantially . . . in parts inventory"); *Aspen Skiing*, 472 U.S. at 587-88, 105 S. Ct. at 2850 (plaintiff developed and maintained its own competitive ski resort and ski packages); *Lorain Journal Co. v. United States*, 342 U.S. 143, 149-50, 72 S. Ct. 181, 184-85, 96 L. Ed. 162 (1951) (injured competitor trying to sell its radio air time for advertisements); *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 221, 39 S. Ct. 68, 69, 63 L. Ed. 211 (1918) (plaintiff "gathers in all parts of the world, by means of various instrumentalities of its own, by exchange with its members, and by other appropriate means, news and intelligence of current and recent events of interest to newspaper readers"); *LePage's*, 324 F.3d at 144 (plaintiff selling its own transparent tape); *Microsoft Corp.*, 253 F.3d at 63

(injured competitors deterred from selling their own computers and browsers); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 854 (2d Cir. 1997) (analyzing free-riding issues and noting that plaintiff did not free-ride because it used its own efforts to conduct business); *U.S. Anchor Mfg.*, 7 F.3d at 990 (plaintiff manufactures and supplies anchors); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 187 (2d Cir. 1992) (plaintiffs purchased product from defendants).

Morris refers to this distinction as PGA's "sweat of the brow" defense and correctly states that it is not a defense *in a copyright case. Feist Pulb'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 359-60, 111 S. Ct. 1282, 1295, 113 L. Ed. 2d 358 (1991) (concluding that "sweat of the brow" is no defense in a copyright case). [Appellant Br. at 53-55.] This well-established rule of copyright law is irrelevant, however, in this antitrust case. The "sweat of the brow" product, to which Morris (and the district court) refer, is no different than, for example, the interconnection services in *Verizon Communications*, 124 S. Ct. at 876, the job shoppers in *Consultants & Designers*, 720 F.2d at 1555, and the sports jackets in *Starter Sportswear*, 964 F.2d at 187.

Moreover, even if we overlook the fundamental and dispositive distinction between this case and the cases cited by Morris, the case law supports summary

judgment in favor of PGA. *See Verizon Communications*, 124 S. Ct. at 879 ("*Aspen Skiing* is at or near the outer boundary of § 2 liability"); *Aspen Skiing*, 472 U.S. at 593-94, 105 S. Ct. at 2852-53 (defendant refused to accommodate and cooperate with plaintiff, refused to *sell* its product to plaintiff, and acted contrary to its own economic interests in order to eliminate plaintiff); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 370-72, 93 S. Ct. 1022, 1026-27, 35 L. Ed. 2d 359 (1973) (defendant was already in the business of *selling* a service to certain customers and refused to *sell* the same service to certain other customers); *Lorain Journal*, 342 U.S. at 148-49, 72 S. Ct. at 183-84 (defendant refused to *sell* to plaintiff in violation of the Sherman Act); *Starter Sportswear*, 964 F.2d at 189-91 (holding, in a factually analogous case, that defendant had valid business justification for refusal to deal); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 562 (7th Cir. 1986) (holding defendant liable under § 2 for refusing to *lease* Chicago Stadium to plaintiff).

The relevant law supports our conclusion that Morris's argument is unavailing and does not show that PGA's business justification is pretextual. The prevention of free-riding, which is an inherently economic motivation, provides a valid business justification on the facts presented here. Accordingly, Morris has not raised any issues of material fact and summary judgment in favor of PGA was

proper. *See Int'l Railways of Cent. Am. v. United Brands Co.*, 532 F.2d 231, 239-40 (2d Cir.), *cert. denied*, 429 U.S. 835 (1976) (stating that proof of a company's reasonable steps to preserve its business interests does not, without more, raise a genuine issue of material fact under § 2).

### E. Morris's Rule 60(b) motion

Relief pursuant to Rule 60(b)(2) is appropriate only if the moving party offers newly discovered evidence that could alter the outcome of the trial. *See Wilson v. Thompson*, 638 F.2d 801, 804 (11th Cir. 1981); Fed. R. Civ. Pro. 60(b)(2). Because we review the district court's decision for abuse of discretion, "it is not enough that a grant of the motion might have been permissible or warranted." *Fackelman v. Bell*, 564 F.2d 734, 736 (5th Cir. 1977). After reviewing the record, we conclude that the district court did not err in finding that the new TOS evidence would have failed to alter the outcome of the trial in light of PGA's valid business justification for its regulations. Accordingly, we hold the district court did not abuse its discretion when it denied the Rule 60 motion.

## IV. CONCLUSION

Contrary to Morris's argument regarding copyright law, this case is not about copyright and the district court did not find the golf scores to be trade

20

secrets.[15]  The district court correctly found that a company – even a monopolist company – that expends time and money to create a valuable product does not violate the antitrust laws when it declines to provide that product to its competitors for free.  PGA has accommodated Morris at every step along the way, has agreed to sell its product to Morris, and has acted appropriately to protect its economic interests and investments.  Yet Morris demands that it be given access to the product of PGA's proprietary RTSS, without compensating PGA, so that Morris can then sell that product to others for a fee.  That is the classic example of "free-riding," the prevention of which, under antitrust law, constitutes a legitimate pro-competitive reason for imposing a restriction.  For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of PGA and the district court's order denying Morris's Rule 60(b) motion.

**AFFIRMED.**

---

[15] "The [PGA]'s property right does not come from copyright law, as copyright law does not protect factual information, like golf scores." *Morris Communications*, 235 F. Supp. 2d at 1281.