[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 30, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-14588

_____

D. C. Docket No. 02-21755-CV-PAS

SPANISH BROADCASTING SYSTEM OF FLORIDA, INC.,

Plaintiff-Appellant,

versus

CLEAR CHANNEL COMMUNICATIONS, INC.,
HISPANIC BROADCASTING CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 30, 2004)**

Before BLACK, BARKETT and MAGILL[*], Circuit Judges.

_____

[*]Honorable Frank J. Magill, United States Senior Judge for the Eighth Circuit,
sitting by designation.

BARKETT, Circuit Judge:

Spanish Broadcasting System ("SBS") appeals the dismissal with prejudice of its First Amended Complaint under Sections One and Two of the Sherman Act against Clear Channel ("CC") and the Hispanic Broadcasting Corporation ("HBC"). SBS and HBC are the two largest owners of Spanish-language radio stations in the United States. SBS owns fourteen stations in seven Spanish-language radio markets, including five of the top ten U.S. Spanish-language radio markets, while HBC owns fifty-five stations and operates in each of the top ten Spanish-language markets. CC owns the largest network of English-language radio stations in the United States, covering some 1200 stations in more than 300 markets. CC also owns 26% of HBC. SBS sued CC and HBC, claiming that they had attempted to limit the ability of SBS to compete in the Spanish-language radio market and sought to drive SBS out of business by engaging in numerous practices made unlawful by the Sherman Act.

Congress passed the Sherman Act, the first major piece of antitrust legislation, in 1890. Following the Civil War, rapid industrialization under relatively limited governmental regulation allowed large firms and coordinated groups in several industries to amass considerable economic power at the expense of smaller rivals. Congress sought to restore a competitive environment and limit

2

the formation, persistence, and power of large, anticompetitive combinations. See, e.g., Apex Hosiery Co. v. Leader, 310 U.S. 469, 491-95 & n.15 (1940) (discussing legislative history). Section One of the Act prohibits contracts, combinations and conspiracies in restraint of trade, while Section Two prohibits monopolization, attempted monopolization and conspiracy to monopolize. 15 U.S.C. §§ 1-2. Although Congress has also barred specific practices through subsequent legislation, and although the interpretation and enforcement of these provisions has varied considerably over time, the Sherman Act remains the basic cornerstone of antitrust law.

Because the Sherman Act contains only general language, courts have played an extremely important role in shaping the reach of the Act and the requirements for stating a cause of action under each section. Critically, under both sections, an antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor. See Am. Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1579 n.8 (11th Cir. 1985) ("Harm to competition is a necessary element of all private antitrust suits under Sections 1 and 2 of the Sherman Act. . . ."). As the Supreme Court has explained:

> [T]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy

3

competition itself.  It does so not out of solicitude for private concerns but out of concern for the public interest.

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993).  This case turns in large part on whether SBS has met its obligation to allege facts that would support a showing of this harm to competition, rather than merely to itself.

The complaint[1] contained claims against both CC and HBC as follows: (1) CC and HBC have conspired to adversely affect SBS's stock price by pressuring analysts not to cover SBS stock, by leaking confidential information about an attempted acquisition of SBS, and by encouraging investors to sell SBS stock; (2) CC and HBC have conspired to make it more difficult for SBS to acquire new radio stations by bidding up prices and by wrongfully appropriating business opportunities created by SBS; and (3) CC and HBC have induced various SBS employees to breach their contracts and join HBC.  In addition, the complaint contained specific claims against CC alone: (4) CC hindered SBS's ability to raise

---

[1]Unless otherwise noted, "complaint" in this opinion refers to the First Amended Complaint.  SBS filed the First Amended Complaint before the defendants filed a response in order to cure technical difficulties with its original pleadings.  The district court also treated allegations made at the oral hearing as part of this complaint.  The court "allowed SBS to rectify orally the facial deficiencies in its Amended Complaint because at this procedural stage, the Court must draw all reasonable inferences in the Plaintiff's favor and consider, in the interests of justice and efficiency, the Plaintiff's best arguments."  Order of Jan. 31, 2003 at 1 n.1.  We have previously allowed district courts to consider allegations made in oral argument on the motion to dismiss.  See, e.g., Oxford Asset Mgmt. v. Jaharis, 297 F.3d 1182, 1194-95 (11th Cir. 2002).  As discussed below, SBS also attempted to file a Second Amended Complaint with its motion for reconsideration.

4

capital by spreading rumors about an SBS executive and by threatening to withdraw CC's own business from an underwriting firm if it worked with SBS; and (5) CC leveraged its ownership of both concert venues and a Hispanic entertainment company in order to discourage advertisers from purchasing time on SBS.

SBS alleged that these practices constituted an agreement between CC and HBC to restrain trade in violation of Section One of the Sherman Act as well as attempted monopolization by both CC and HBC of the major Spanish-language radio markets in violation of Section Two of the Act. In addition to federal antitrust violations, SBS claimed causes of action under Florida and California statutes and under various common law theories.

The district court dismissed SBS's complaint with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), after concluding that SBS could not meet the requirements necessary to maintain a Sherman antitrust suit. On appeal, SBS argues that the district court erred as a matter of law in dismissing the complaint, abused its discretion in failing to grant leave to amend the complaint, and erred in dismissing the complaint with prejudice.

We review de novo a district court decision to dismiss an antitrust complaint under Rule 12(b)(6) for failure to state a claim. Lowell v. Am. Cyanamid Co., 177

F.3d 1228, 1229 (11th Cir. 1999). We accept the factual allegations in the complaint as true and make all reasonable inferences in favor of the non-moving party. The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low, and Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases. <u>Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.</u>, 711 F.2d 989, 994-95 (11th Cir. 1983). The complaint should only be dismissed with prejudice if it appears beyond doubt that SBS can prove no set of facts which would entitle it to relief. <u>St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.</u>, 795 F.2d 948, 953 (11th Cir. 1986).

In this case, neither the complaint nor the appellate briefs are models of clarity in defining the precise claims brought under the antitrust laws or describing how the factual allegations in the complaint satisfy the necessary elements of each specific claim. Nonetheless, we will attempt to categorize the claims in terms of existing antitrust case law.

## I. Sherman Act Section One

Section One of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.  Thus, Section One prohibits combinations and conspiracies that restrain interstate or foreign trade.  This provision applies both to agreements between companies that directly compete with one another, called "horizontal" agreements, and to agreements between businesses operating at different levels of the same product's production chain or distribution chain, known as "vertical" agreements.  In addition, although some restraints on trade remain illegal per se, such as certain agreements to fix prices, most asserted antitrust violations now require "the finder of fact [to] decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) (emphasis added).  Section One claims that do not allege per se antitrust violations are analyzed under this "rule of reason," and the claims fail if the restraint on trade is reasonable.  Both parties accept that the rule of reason applies to the Section One claims raised by SBS in this case.

Section One applies only to agreements between two or more businesses; it does not cover unilateral conduct.  Fisher v. City of Berkeley, 475 U.S. 260, 266 (1986) ("Even where a single firm's restraints directly affect prices and have the

7

same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement."). Thus, for the purposes of our Section One analysis, we only consider the alleged conspiracy between CC and HBC. Unfortunately, SBS does not specify the precise nature of the agreement alleged in its complaint or connect it to any particular anti-trust theory identified in the case law. Even if we were to assume that CC and HBC acted in concert for purposes of Section One, however, we would still affirm here, given that SBS failed to allege sufficient anticompetitive effect, a critical component of any antitrust claim.

Under Eleventh Circuit case law, alleged Section One agreements analyzed under the rule of reason require a plaintiff "to prove (1) the anticompetitive effect of the defendant's conduct on the relevant market[2], and (2) that the defendant's conduct has no pro-competitive benefit or justification." Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996). In alleging "the anticompetitive effect of the defendant's conduct," an antitrust plaintiff must show harm to competition rather than to competitors. That is, the "anticompetitive effects" are measured by their impact on the market rather than by their impact on competitors. See, e.g., Dickson v. Microsoft Corp., 309 F.3d 193, 206 (4th Cir.

[2]SBS asserted that it considered the relevant market to be advertising purchased in the top ten Spanish-language markets and that HBC earned 51% of the advertising revenue in that market. For the purposes of the 12(b)(6) motion, the district court assumed that a relevant market had been shown for the Section One claims. We make the same assumption here.

8

2002) ("To have an 'anticompetitive effect,' conduct 'must harm the competitive process and thereby harm consumers . . . [H]arm to one or many competitors will not suffice.'") (quoting United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001)).  In order to prove this anticompetitive effect on the market, the plaintiff "may either prove that the defendants' behavior had an actual detrimental effect on competition, or that the behavior had the potential for genuine adverse effects on competition."  Levine, 72 F.3d at 1551 (internal quotations omitted).

In an attempt to meet this burden, SBS focuses upon the harm it allegedly suffered at the hands of HBC and CC, such as weakened stock prices, restricted access to capital markets, loss of employees, damaged reputation, and loss of advertising revenue.  None of these allegations assert damage to competition itself rather than damage to SBS, one competitor in the Spanish-language advertising market.  As the district court indicated, the amended complaint contains no allegations at all about a factual connection between the conduct alleged and overall impact on the advertising market.  Indeed, at oral argument before the district court, SBS stated that CC worked to keep Spanish-language advertising rates *lower* in order to maximize English-language advertising revenues.

In Aquatherm Industries v. Florida Power & Light Co., 145 F.3d 1258 (11th Cir. 1998), we upheld a Rule 12(b)(6) dismissal of a claim that the defendant's

9

actions, including the dissemination of false information, violated the Sherman

Act. We emphasized that damage to a single competitor, even as a result of

deliberate misinformation, does not state a claim under Section One of the

Sherman Act:

> Aquatherm does not show, or even claim, that the actions by FPL harmed competition in the [relevant] market. Its only claim is FPL acted unfairly by disseminating false information, and this unfair competition in turn harmed Aquatherm's business. This claim of unfair competition is *not* sufficient to support a claim under § 1 or any other federal antitrust provision. As long as no restraint on competition occurred, there is no cause of action under § 1.

Aquatherm, 145 F.3d at 1263 (emphasis in original). Here, as well, we find that

although SBS may have alleged "unfair" competitive practices, it did not

adequately allege actual harm to competition.

On appeal, the plaintiffs argue that because SBS is the primary competitor of

HBC in the Spanish-language advertising market, any damage it suffers inherently

damages competition in that market. They rely upon Full Draw Productions v.

Easton Sports, Inc., 182 F.3d 745 (10th Cir. 1999), and Caribbean Broadcasting

System, Ltd. v. Cable & Wireless PLC, 148 F.3d 1080 (D.C. Cir. 1998), as

examples of complaints that survived motions to dismiss despite alleging damage

to only one competitor. However, in those two cases, the plaintiffs also alleged

harm to competition in general by pointing to the specific damage done to

consumers in the relevant market. See Full Draw, 182 F.3d at 753-54 (discussing

the reduction in exhibition space at archery trade shows following the complete elimination of the sole competitor); Carribean Broadcasting, 148 F.3d at 1086-87 (discussing allegations that the defendants' complete monopoly on Caribbean English-language FM radio advertising actually caused consumers to pay higher prices and that the defendants' deceptive practices and frivolous objections to the plaintiff's license application helped sustain that monopoly). In both cases, the defendants' anticompetitive practices achieved a complete monopoly in the relevant market, leaving consumers with no alternative. That is simply not the case here. Although damage to a critical competitor *may* also damage competition in general, SBS bears the burden of drawing that implication with specific factual allegations. It has not done so here.[3]

Concluding that no "actual damage to competition" has been sufficiently alleged in the plaintiff's amended complaint, we turn to the alternative method for alleging an anticompetitive effect: the "potential for genuine adverse effects on competition." Levine, 72 F.3d at 1551. At a minimum, this requires a plaintiff to "define the relevant market and establish that the defendants possessed power in

---

[3]We also note that the market for Spanish-language radio advertising is not limited to two competitors, as the argument by SBS implies. According to the numbers provided by SBS to the district court, some 26% of the market is not controlled by either HBC or SBS. That 26% includes the 10% market share belonging to Entravision, which is one-third owned by Univision, HBC's new merger partner. SBS made these factual allegations at the hearing on the motion to dismiss before the district court. Tr. at 20-23. See also supra note 1 (explaining the district court's consideration of allegations made at the hearing on the motion to dismiss).

11

that market." <u>Maris Distrib. Co. v. Anheuser-Busch, Inc.</u>, 302 F.3d 1207, 1213 (11th Cir. 2002); <u>see also</u> <u>Levine</u>, 72 F.3d at 1551. For this claim, we assume without deciding, as did the district court, that the plaintiffs have alleged adequate market power in the relevant market. However, market power alone cannot be sufficient to show the potential for genuine adverse effects on competition. In <u>FTC v. Indiana Federation of Dentists</u>, 476 U.S. 447 (1986), the case from which the Eleventh Circuit drew its test, <u>see</u> <u>Levine</u>, 72 F.3d at 1551, the Supreme Court never stated that market power alone could establish the potential for genuine adverse effects on competition. Rather, because the Court found "actual, sustained adverse effects on competition," there was no need for additional inquiry into market power. 476 U.S. at 460-61. Similarly, in an earlier case on vertical price restraints in this circuit, we noted that market power would not be enough to state a Section One claim under the rule of reason:

> The burden of proving unreasonable effects in a rule of reason case rests with the antitrust plaintiff. Therefore, [the plaintiff], after crossing the threshold of showing [the defendant's] market power, was required to establish that the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price, and hence of consumer welfare.

<u>Graphic Prods. Distribs., Inc. v. Itek Corp.</u>, 717 F.2d 1560, 1573 (11th Cir. 1983) (internal citations and punctuation omitted). Other courts of appeals have reached the same conclusion and required specific allegations linking market power to

12

harm to competition in that market. As the Second Circuit recently stated:

> Even assuming this market share data implies that [the defendant] possessed market power, [the plaintiff] still would fail to satisfy its burden under the adverse-effect requirement. Market power, while necessary to show adverse effect indirectly, alone is insufficient. A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market.

Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 97 (2d Cir. 1998) (citations omitted); see also Dickson, 309 F.3d at 205-07.

In this case, SBS has not described how the defendants' alleged behavior would be likely to harm competition. In fact, as the district court noted, SBS has expanded considerably over the past few years, has a share of the New York, Chicago and Miami markets somewhat comparable to that of HBC, and was itself engaged in merger talks with HBC. By its own admission, advertisers continue to shift larger portions of their budget toward the Spanish-language market as that market grows. SBS admitted that consumers currently pay less for Spanish-language advertising than they might in the absence of CC's activities. Given these alleged facts,[4] and in the absence of specific allegations detailing the threat to the Spanish-language advertising market, SBS did not state a claim for relief against CC or HBC under Section One, and the district did not err in dismissing the

_____

[4]See Amended Complaint ¶ 12; Tr. at 20-23, 34-38.

13

Section One claims of the First Amended Complaint.


## II. Sherman Act Section Two

Section Two of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . .

15 U.S.C. § 2. Thus, Section Two makes it a crime to monopolize, to attempt to monopolize, or to conspire to monopolize any part of interstate or foreign trade. This provision covers behavior by a single business as well as coordinated action taken by several businesses.

The First Amended Complaint alleged only attempted monopolization, which involves three distinct elements: "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, 506 U.S. at 456.

Like claims under Section One, Section Two claims require harm to competition that must occur within a "relevant", that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue. See U.S. Anchor Mfg. v. Rule Indus., 7 F.3d 986, 995 (11th Cir. 1993)

14

("Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.").[5]  Under Section One, this "relevant market" must have been harmed by an unreasonable restraint on trade, <u>L.A. Draper & Son v. Wheelabrator-Frye, Inc.</u>, 735 F.2d 414, 421 (11th Cir. 1984), while under Section Two, the alleged monopolist must possess enough power or potential power in this "relevant market" in order to harm competition.  <u>Morris Communications Corp. v. PGA Tour, Inc.</u>, 364 F.3d 1288, 1293-94 (11th Cir. 2004).  As noted above, SBS explained that it considered the relevant market to be advertising purchased in the top ten Spanish-language markets and that HBC earned 51% of the advertising revenue in that market.

We first address the allegations as they pertain to CC.  There is no question that CC does not participate in the Spanish-language radio market.  Thus, CC cannot attempt to monopolize that market.  <u>See</u> <u>Aquatherm</u>, 145 F.3d at 1261 (rejecting an attempted monopolization claim against a defendant who did not compete in the relevant market).  SBS attempts to overcome this hurdle by pointing

---

[5]Many antitrust cases turn on the precise definition of this market, as defendants contest whether they possess market power or whether the restraint at issue affected the market as a whole.

out that CC owns 26% of HBC, implying that this either makes CC an effective participant in the relevant market or at least gives CC sufficient control over HBC to permit attempted monopolization. We reject this contention. Absent allegations of significant control over the policies of a subsidiary, a minority ownership share does not convert a parent corporation into a competitor. In Caribbean Broadcasting, a case heavily relied upon by SBS, the D.C. Circuit specifically rejected a claim against a parent corporation grounded upon a 27% ownership interest in the plaintiff's direct competitor. 148 F.3d at 1088. As the court noted, "one company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiary's rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." Id.

Although the complaint alleges that CC has "veto power" over HBC merger and stock decisions, the complaint contains no allegations with respect to control over day-to-day operations or general corporate policies.[6] In fact, the (sealed) Second Amended Complaint contains factual allegations inconsistent with that

_____

[6]The complaint notes that the Department of Justice considered the two companies "sufficiently related" so as to block the transfer of radio stations. This does not imply control over day-to-day operations. Similarly, the allegation that CC executives acted "on behalf of HBC" may imply an agreement or conspiracy but not control such that CC should be considered a participant in the market.

16

level of influence. SBS has pointed to no case in which a minority shareholder can attempt to monopolize a market on behalf of its subsidiary, nor can we locate one. Thus, the only Section Two claim available against CC might be conspiracy to monopolize, which was not raised in the First Amended Complaint.[7] Accordingly, because CC does not participate in the relevant market, SBS's attempted monopolization claim against CC was properly dismissed.

We therefore turn to the attempted monopolization claim against HBC. The first element of this claim requires a plaintiff to allege facts that show that the defendant has engaged in predatory or anticompetitive conduct. This anticompetitive conduct criterion captures the critical antitrust idea of harm to competition, rather than to competitors. "Regardless of the defendant's power or intent, its conduct may be incapable of producing monopoly, and thus unable to satisfy the attempt requirement." Areeda & Hovenkamp, IIIA Antitrust Law ¶ 806 (2002). In fact, "the conduct requirement is arguably the single most important aspect" of attempted monopolization. Northeastern Tel. Co. v. Am. Tel. & Tel. Co., 651 F.2d 76, 85 (2d Cir. 1981).

As with Section One claims, conduct that injures individual firms rather than

---

[7]Moreover, even if SBS had alleged sufficient control over HBC by CC to state a claim for attempted monopolization by CC, this would not have cured the complaint's failure to allege harm to competition rather than harm to SBS alone.

17

competition in the market as a whole does not violate Section Two. The Supreme

Court has explained that "[e]ven an act of pure malice by one business competitor

against another does not, without more, state a claim under the federal antitrust

laws." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209,

225 (1993). In this circuit, we have affirmed a directed verdict on an attempted

monopolization claim in part because the plaintiff "failed to demonstrate any

cognizable anticompetitive effect of [the defendant's] unfair competition." Mfg.

Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982). We

noted that "[o]ur cases have recognized that injury to a competitor need not always

result in injury to competition. The use of unfair means resulting in the

substitution of one competitor for another without more does not violate the

antitrust laws." Id. Similarly, the Ninth Circuit upheld the dismissal of an

attempted monopolization claim for failure to state a claim because the complaint

merely alleged an attempt to eliminate two firms from the market rather than injury

to competition:

> Nowhere in their AFA complaint, however, do appellants allege injury to the
> competitive market for PB [polybutylene]. Instead, they allege that the
> actions between Shell Oil defendants and their overseas affiliates "were
> taken for the purpose of eliminating [appellants] as representatives of Shell
> Chemical and as sellers of PB and PB-related products, and for the financial
> benefit of defendant Shell Chemical and the parties acting in concert with
> such defendant." Thus appellants fail to state an antitrust claim based on
> defendants' conduct with respect to PB and PB-related products. It is injury

18

> to the market or to competition in general, not merely injury to individuals or individual firms that is significant.

McGlinchy v. Shell Chem. Co., 845 F.2d 802, 812-13 (9th Cir. 1988); see also Joseph Bauer & William H. Page, II Kintner's Federal Antitrust Law ¶ 14.35 (2002) (noting that "practices that harm other firms without harming competition . . . cannot constitute unlawfully exclusionary conduct in the attempt context.")

Careful examination of the First Amended Complaint reveals no allegations of anticompetitive conduct that could sustain a claim under Section Two. With respect to HBC, SBS alleges that HBC leveraged its relationship with CC to obtain preferential treatment from auditors and investors, discouraged analysts and investors from dealing with SBS, misrepresented the state of SBS's finances in order to adversely affect SBS's stock price, and engaged in a bidding war with SBS over a Los Angeles radio station. As with the Section One claims, SBS essentially urges us to equate harm to it with harm to competition as a matter of law. We do not believe the law supports this proposition. While some of these specific practices might be characterized as unsavory, or even illegal under other laws,[8] they do not give rise to a federal antitrust claim without factual allegations specifically addressing how these practices have harmed competition. As the

---

[8]We need not decide whether any of these alleged practices would give rise to state law claims. We merely note that they do not automatically give rise to an antitrust claim.

Supreme Court has stated, the antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." Brooke Group, 509 U.S. at 225 (internal quotation marks omitted). Because SBS has not alleged any harm to competition in the market, nor explained how any of the actions taken by HBC could lead to monopolization of that market, SBS has not alleged anticompetitive conduct and thus has not stated a claim against HBC under Section Two.[9]

### III. The Second Amended Complaint

Following the dismissal of its amended complaint with prejudice, SBS filed a motion for reconsideration along with a proposed Second Amended Complaint. The court conducted a "careful review of the proposed Second Amended Complaint" and concluded that SBS "cannot allege facts to survive dismissal." Order of Aug. 6, 2003, at 3 n.3 & 5. The court therefore denied the motion.

We review the denial of leave to amend for abuse of discretion. Long v. Satz, 181 F.3d 1275, 1278 (11th Cir. 1999); O'Neal v. Kennamer, 958 F.2d 1044, 1047 (11th Cir. 1992). Under the Federal Rules of Civil Procedure, leave to amend

---

[9]As with the Section One claims, SBS also argues that, as the principal competitor of HBC in the market, harm to it inherently constitutes harm to competition. For the reasons stated in the previous section, we reject this argument.

"shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court has emphasized that leave to amend must be granted absent a specific, significant reason for denial:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given.

Foman v. Davis, 371 U.S. 178, 182 (1962) (internal quotation marks omitted). In this circuit, these "same standards apply when a plaintiff seeks to amend after a judgment of dismissal has been entered by asking the district court to vacate its order of dismissal pursuant to Fed. R. Civ. P. 59(e)." Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir. 1988). The district court found that the proposed amendments were futile because the Second Amended Complaint still failed to state a claim. Our review of the denial of leave to amend therefore turns on our assessment of whether the proposed complaint indeed failed to state a claim for relief.

As with the First Amended Complaint, we must accept the facts pleaded in the proposed Second Amended Complaint as true and construe them in the light most favorable to the plaintiffs. An antitrust complaint need only meet an "exceedingly low" threshold of sufficiency in order to state a claim for relief and

survive a motion to dismiss.  Covad Communications Co. v. BellSouth Corp., 299

F.3d 1272, 1279 (11th Cir. 2002), vacated on other grounds by 124 S.Ct. 1143

(Jan. 20, 2004).  Of course,"[w]e must not . . . assume plaintiffs can prove facts not

alleged or that defendants have violated the antitrust laws in ways not alleged."

Quality Foods, 711 F.2d at 995.  Moreover, even in our liberal pleading regime,

antitrust plaintiffs must allege facts in support of each element of an antitrust

violation:

> [T]he Supreme Court has indicated that a complaint should not be dismissed
> unless it is found to be wholly frivolous. . . . This is not to say that liberal
> pleading requirements negate the need to draft an antitrust complaint in a
> careful and thoughtful fashion.  An antitrust complaint must comprehend a
> so-called prima facie case, and enough data must be pleaded so that each
> element of the alleged antitrust violation can be properly identified.
> Conclusory allegations that defendant violated the antitrust laws and plaintiff
> was injured thereby will not survive a motion to dismiss if not supported by
> facts constituting a legitimate claim for relief.  However, the alleged facts
> need not be spelled out with exactitude, nor must recovery appear imminent.

Id. (citations and internal quotation marks omitted).  With these principles in mind,

we turn to the allegations of the proposed Second Amended Complaint, which, in

addition to the claims discussed above, contains the further claim that HBC and CC

conspired to monopolize the market for Spanish-language radio advertising in

violation of Section Two of the Sherman Act.[10]

---

[10]In its original order, the district court denied a previous request by SBS to amend the
complaint and add a conspiracy allegation after finding that a non-participant in the market could
not conspire with a participant. The court relied upon our statement in Aquatherm that "[e]qually

22

Conspiracy under Eleventh Circuit law requires (1) an agreement in restraint of trade (2) deliberately entered into with the specific intent of achieving a monopoly (3) which could have had an anticompetitive effect and (4) at least one overt act in furtherance of the conspiracy. U.S. Anchor, 7 F.3d at 1001. As with the Section One allegations in the first complaint, we agree with the district court that SBS has not alleged facts that would support a finding of "anticompetitive effect" in the relevant market. That is, we still do not believe that SBS has alleged facts sufficient to support a finding of harm to competition.

In dismissing the previous complaint with prejudice, the district court noted that "the Plaintiff has amended its complaint once already. The Court gave the Plaintiff extensive time to address the injury to competition element at oral argument. Still, SBS could only provide one vague and conclus[o]ry allegation of

_____

fatal to Aquatherm's conspiracy allegation is the fact that no authority exists holding a defendant can conspire to monopolize a market in which it does not compete." 145 F.3d at 1262 n.4. However, in Aquatherm the plaintiffs did not name (or even identify) the alleged co-conspirators who participated in the relevant market. In this case, SBS alleges a conspiracy between HBC, a clear market participant, and CC. Nothing in our case law suggests that a conspiracy must be limited solely to market participants so long as the conspiracy also involves a market participant and the non-participant has an incentive to join the conspiracy. Cf. Spectators' Communication Network, Inc. v. Colonial Country Club, 253 F.3d 215, 222 (5th Cir. 2001) ("[W]e conclude that there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive."). In its brief, CC correctly points out that Spectators involved a group boycott with multiple conspirators, thereby giving the non-participant defendant the power to injure the plaintiff. Appellee CC Br. at 18-19. However, the case turned upon the ability and motive of the defendant to injure the plaintiff (and competition in general), not whether that power came from more than one co-conspirator.

23

injury to general competition." Order of Jan. 31, 2003, at 21. SBS now argues that it has added language sufficient to overcome this finding by including specific references to "injury to competition." We disagree.

Careful review of the proposed complaint reveals only two general, conclusory statements about current injury to competition.[11] The complaint states that "Defendants' exploitation of their dominance of those markets has caused injury to competition by limiting alternatives available to advertisers, performers and the listening audience." Proposed Compl. at ¶ 108. The complaint also states that "[defendants'] conduct has and will continue to affect prices for advertisements, the quality of programming, and the prices for advertisers' products." Id. at ¶ 112. We note that neither statement claims that prices have actually risen or that the quantity of available Spanish-language advertising time has actually decreased. Nor is it clear what is meant by "limiting alternatives." Neither of these statements alleges actual harm to competition.

In addition, the complaint contains several vague statements about the potential general consequences of hypothetical monopolization of the Spanish-

---

[11]The proposed complaint adds significant detail to the allegations of unsavory behavior by CC and HBC described in the First Amended Complaint as well as additional detail on the market for Spanish-language radio advertising. Largely because of this detail, the proposed complaint remains under seal. We therefore do not describe these additional factual allegations with specificity.

language radio market: it "ultimately results in supra-competitive prices for advertisements and reduces the number of Spanish stations available." Id. at ¶ 113. A reduction in the number of stations, in turn, "reduces the inventory of available advertisements and hinders the advertisers' ability to target Hispanics of different origins." Id. Finally, this situation "ultimately results in higher prices for the advertisers' products," "will likely deteriorate programming quality," and "affect the viability of artists in the marketplace." Id. at ¶¶ 114-16. Unfortunately, SBS offers no specific factual allegations to support the likelihood of any of this happening. Rather, SBS merely assumes, conclusorily, a pernicious monopoly capable of limiting output and raising prices and then proceeds to describe the other evils that might flow from this monopoly. We hold that these conclusory allegations, unsupported by specific factual allegations, do not state a claim for relief under the antitrust laws. Because SBS, even in the proposed Second Amended Complaint, offered only conclusory allegations of harm to competition, we cannot say that the district court abused its discretion in denying the motion for reconsideration and the implicit motion for leave to amend the complaint.

**AFFIRMED.**